**TALACHE MINES Incorporated, a Corporation, Appellant,**

v.

**UNITED STATES of America, John R. Viley, Individually and as Former Collector of Internal Revenue for the District of Idaho, and Calvin E. Wright, Collector of Internal Revenue for the District of Idaho, Appellees.**

No. 13577.

United States Court of Appeals, Ninth Circuit.

Dec. 28, 1954.

Rehearing Denied March 4, 1955.

W. H. Langroise, W. E. Sullivan, Boise, Idaho, for appellant.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Alonzo W. Watson, Jr., A. F. Prescott, Melva M. Graney, Sp. Assts. to Atty. Gen., Sherman F. Furey, Jr., U. S. Atty., Boise, Idaho, Herman Rossi, Wallace, Idaho, Sylvan A. Jeppesen, Asst. U. S. Attys., Boise, Idaho, for appellees.

Before BONE, ORR and POPE, Circuit Judges.

BONE, Circuit Judge.

This appeal involves federal income taxes (a deficiency assessment of $22,-773.22 paid in 1946). Appellant sued for a refund after the Commissioner had rejected a claim therefor, and the lower court sustained the assessment and dismissed appellant's action. This appeal followed. The findings, conclusions and order for judgment of the lower court are set out in Talache Mines, Inc., v. United States, D.C., 108 F.Supp. 25.

A preliminary reference to the facts will be helpful. In 1917 and 1918, appellant acquired the Idaho mining properties referred to in the lower court's opinion but did not place these properties in production until 1922. It operated them until 1926 and thereafter leased them until the year 1941. Appellant's claim is that in 1942 it permanently abandoned and discarded these properties because unforeseen changes in business conditions terminated their usefulness and made them valueless to appellant. In its complaint below it averred that since this abandonment it has never used said properties in its (mining) business nor for any purpose, nor has any other person mined said property or removed mineral products therefrom.

Appellant claimed a deduction in its 1942 income tax return for loss result-

ing from this asserted adandonment *in that year*, as provided in title 26 U.S. C.A. § 23(f).[1] The sum of $50,000 was finally allowed as a 1942 loss, but the further claimed sum of $169,773.57 was disallowed and rejected by the Commissioner, and as a result of the disallowance and rejection of this larger portion of appellant's claimed abandonment loss, the deficiency income tax above noted was assessed against appellant and collected.

On this appeal, appellant assails as error only one finding of fact (No. 9) of the lower court which reads as follows:

"That the plaintiff did not give any notice to the public at any time nor during the year in question, to wit, 1942, of his abandonment of the property, nor did plaintiff renounce the title or his interest in any of the unpatented mining claims nor do any affirmative act showing an abandonment of the mining claims, but retained title and exercised its claim and control over the property until the same was sold."

Appellant separately assails as errors of law the lower court's Conclusions of Law Nos. 2 to 5, inclusive. We assume that appellant charges such errors because these Conclusions failed to declare that the 1942 acts of appellant referred to in Finding No. 6 were affirmative acts which legally constituted a bona fide abandonment of the mining property.

In support of its contention that the lower court erred in the above particulars, appellant urges that it is not necessary under federal law that, in order to constitute an abandonment, the taxpayer must divorce itself from all interest of value in the property or that the property become worthless in the year of abandonment. This being the case, the property may be retained and later disposed of for salvage value, since the applicable law does not require complete severance or disposal of legal title of property before an abandonment loss may be claimed. This contention is advanced as a general proposition of law.

### The Facts

Aside from one other witness whose brief testimony is not relevant to the issue of abandonment, Mr. Burroughs was the only witness testifying at the trial. He was president and general manager of appellant and since 1928 had been the owner of all of its capital stock. All of the corporate actions of appellant referred to below were performed by Burroughs for and on behalf of appellant, and he indicates as being its corporate action all that he did in respect to matters related to the claim of abandonment. He testified that the Talache mining property had shrunk in value up to 1942 to a point where it had become useless to the company; that it abandoned the mine by removal of equipment (after the fashion described by the lower court in Finding No. 6) and allowed it to cave in.

Burroughs further testified that a notice of abandonment was not posted in 1942, nor was such a notice published in any local newspaper in that year advising of the intention of appellant to abandon its mining property. He asserted that he did not "do any act" to show an "intention" of appellant to hold the property for mining purposes; he admitted that he was familiar with the provisions of federal statutes that permitted mining operators "to file a notice of intention to hold (unpatented claims) in lieu of assessment work"; he admitted that in 1942 (when he claimed that the mining property was abandoned) "we filed notice of intention to hold [the unpatented] mining claims," and that in each of the succeeding years of 1943 and 1944 the same kind of no-

1. Section 23(f) of the Internal Revenue Code allows as deductions *losses* by corporations if sustained during the taxable year and if not compensated for by insurance or otherwise.

tice respecting these claims was filed. (These notices were filed with the County Recorder of Bonner County, Idaho in which County the claims were located, see Finding No. 7.) In its brief on appeal, appellant tells us that the "notices of intention" here referred to were filed "to hold the unpatented claims"—that "the reason for this action was to maintain the property intact in the effort to realize the salvage value through its recreational uses." In this connection, Burroughs also testified that if appellant wanted to hold (retain) the unpatented claims it "would have to do the assessment work or file the intention." He further testified that appellant "paid taxes on 18 patented claims for the years 1942 to 1945."

In his testimony Burroughs assigned as a reason for filing the "notice of intention" in 1942 that "when we abandoned the mine I set up on the books at that time a $30,000.00 as the valuation on the property up there for the purpose, primarily, recreational and perhaps among the claims that were unpatented there were some that surrounded this home and the development around there that Mr. Armstead had made about a mile from the mine * * *. I wanted to hold [all of] the property altogether to make it available if I could and to see if I could get the value of the tax instead of on the books." Apparently "this home" and the surrounding unpatented mining claims held by appellant represented a portion of the "interest" therein Burroughs wanted to retain after the claimed abandonment of the mining properties. He testified that *this retention was not for any mining purpose* but because the potential recreational worth of the home and site offered a chance for salvage through a later sale. This home along with the patented and unpatented mining claims. of appellant, were subsequently sold for $30,000 in 1947.

While appellant averred in its complaint that no effort had been made (up to the time of filing the complaint) to recover minerals from the mine since its "abandonment", the record does not disclose how much value the purchaser who bought the home along with all of the mining claims conveyed in 1947, may have attributed to the mineral value of the mining claims it purchased in this transaction.[2] The home here involved was located on Lake Pend Oreille on unpatented mining claims. about one mile from the mine portal and presumptively possessed some value for recreational purposes.

With the foregoing background of facts not in serious dispute and clearly shown by the record on appeal, the parties appear to be in agreement that the ultimate issue for decision boils. down to whether or not appellant legally "abandoned" its Bonner County mining properties in 1942. If it did, the deficiency assessment was improperly made and appellant is entitled to recover judgment for the amount paid on this assessment, with interest from date of payment.

### Appellant's Contention

Appellant's brief clearly sets forth its contentions and the authority therefor:

"* * * The sole issue now present in this case on appeal is, as it was in the lower court, whether or not appellant had abandoned its mining properties at Talache, Idaho, in the year 1942 so as to permit it to deduct the loss result-

2. The lower court found (Finding 8) that in 1947 appellant sold for recreational purposes *all of the mining claims, both patented and unpatented,* together with appellant's interest in the buildings (the "home") situated on appellant's unpatented claims, and in 1948 delivered a warranty deed to the purchaser for its 18 patented claims, and a quitclaim deed to its 44 unpatented claims, together with a bill of sale to the buildings, structures. and improvements (the "home" property) located on 2.07 acres of ground held by appellant under a "Special Use" permit from a National Forest Reserve. This. finding is fully established as true by the record and the testimony of Burroughs.

ing therefrom, under the provisions of Title 26 U.S.C.A. Sec. 23(f.).

"The appellant claims the deduction of its loss resulting from its abandonment of the mine in the year 1942 under Title 26 U.S.C.A., Sec. 23(f.), which permits a deduction in computing income tax, as follows:

" 'In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.'

"The regulation applicable to a deduction resulting from the abandonment of capital assets is Income Tax Regulations III, Sec. 29.-23(e)-3, as follows:

" 'Sec. 29.23(e)-3. Loss of useful value.—When through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer * * * discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted * * *) and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded * *.'

"A general discussion of the law on abandonment is found in 5 Mertens, Law of Federal Income Taxation, in the following Sections:

"Sec. 28.17 'Loss may also be realized on the * * * permanent abandonment or discarding of an asset, such as buildings or machinery and equipment, or other assets, the loss being offset by the salvage value, if any. Of course, if salvage value, plus depreciation, exceeds the basis for the property, there will be no loss and there may be a taxable gain. In such cases a requirement that the loss be evidenced by a sale would be necessarily fictitious, it would not only not establish the occurrence of the loss but would even be misleading as to the real year in which the loss was actually sustained. As one court has said: "To extend the usual doctrine so far would serve only to allow a taxpayer to manipulate his loss." '

"Again at paragraphs 28.18 and 28.20 it is stated in part:

" 'What constitutes abandonment. There must be abandonment if this type of loss is to be allowed; continued use will vitiate the deduction. *Whether there has been an abandonment of property depends upon the intention of the owner coupled with the act of abandonment, both to be ascertained from all the surrounding facts and circumstances.*

" 'Generally speaking, there should be some overt act to indicate abandonment. The discontinuance of use is not equivalent to abandonment. * * * Furthermore, the fact that property with proper care might be kept in use indefinitely does not preclude the deduction. There is an abandonment where, due to a change in business conditions, a building cannot be used for the purpose for which it was specially designated and must be devoted to a radically different use, requiring costly alterations.' " (Italics ours.)

### Discussion of the Issue

Appellant could *maintain its interest* in the property (on the unpatented claims) only so long as it did $100 worth of labor or improvements a year toward developing the mine, 30 U.S.C.A. § 28.[3]

---

3. Pine Grove Nevada Gold Mining Co. v. Freeman, 1946, 63 Nev. 357, 171 P.2d 366, 376 is a case which construed 30 U.S.C.A. § 28 and § 28a in connection with an action to quiet title to an unpatented mining claim which was assertedly lost

Effective in 1942, this provision was amended (by section 28a) which allowed a mine claimant to maintain its interest in the unpatented mining claims by filing a declaration of desire to hold these mining claims. As the facts clearly show, in 1942, 1943 and 1944, appellant filed and caused to be recorded *notices of desire to hold all of its unpatented mining claims.* It seems clear that appellant thus hoped to circumvent the inconsistency between (1) declaring a desire to hold these claims (thereby retaining the legal right to possess and exploit them), and (2) its claim, for income tax purposes, that it had completely abandoned its entire mine and the minerals therein, as a result of which operation it had sustained a loss under I.R.C. Section 23(f), and Treasury Regs. III, 29.23(e)–3. Appellant's position here and below is that while in the year 1942 it completely abandoned its mine, it could nevertheless lawfully retain complete dominion and control over, and/or legal right to, all of the surface of the land involved in all of the various claims, patented and unpatented, so that this entire surface area could be sold in later years for possible use as a sportsman's resort.

In other words, its contention is that the recording of the declaration of desire to hold the unpatented mining claims and payment of taxes on the patented claims, as aforesaid, are acts not inconsistent with the claim that under 23(f)

it totally *abandoned* the mine and minerals.

In the Memorandum Decision of the Lower Court, Judge Healy said:

"I have great difficulty in escaping the proposition that there cannot be said to have been an abandonment or discard of the subsurface mineral in 1942, as contemplated by the Regulations, in view of the admission of plaintiff's president that declarations of intention to continue to hold the unpatented claims were filed subsequently for the years 1943 and 1944. *This intention in legal contemplation necessarily related to the claims as mineral ground.*" (Italics ours.)

The United States is the owner of the unpatented claims here involved. Appellant merely had the right to exploit the mineral wealth in such claims. Appellant cites no case and no authority for its unique claim that it can wholly abandon a mine and the minerals therein for income tax loss purposes for one tax year, and in the very same year (and following years) execute and file a declaration of desire to hold its unpatented mining claims. A valid mining claim (or claims) necessarily includes control over the surface of such unpatented claim or claims along with a legal right to remove the subsurface minerals. Appellant's president stated that all of the ore which had been taken out of the mine had come from the unpatented claims.[4] The major portion of appel-

---

because of non-compliance with § 28 or § 28a. In discussing § 28, the Nevada court said:

"The obligation of doing the annual assessment work is the obligation assumed by the locator of a mining claim, as a condition of his right to hold and develop the claim. The government desires the development of its mineral resources, and, instead of leasing the property and requiring a payment of rent, requires, as compensation for the right to hold and develop the property and extract the fruits of such development, that the claimant perform annual assessment work. This involves labor and the expenditure of money, or its equivalent, for supplies. It is the price the claimant

pays for his right of possession and exploitation."

4. Mr. A. H. Burroughs, Jr., testified as follows:

"The Court: Were they all adjoining claims? A. Some were patented and some were not, about half were patented claims.

"Q. And with respect to those, Mr. Burroughs, where was the mining done by the Talache Mines, that is, with respect to whether it was patented claims or not? A. *All of the ore removed by the Talache came from the Little Joe, the vein outcropped on the Little Joe and the extension of the claim, they were not patented, they were unpatented claims.*

"Q. They were unpatented? A. Yes."

lant's tax basis came from expenditures on the development of the mine. We must assume that considerable of this development cost was necessarily expended on the unpatented claims since concededly all of the ore taken out was removed from these unpatented claims. It appears that at least the major portion of the value of the asset assertedly abandoned was within the unpatented claims which were the subject of the declarations of desire to hold.

Appellant has relied heavily upon the holding of a 1932 case, Colorado & Utah Coal Co. v. Commissioner, 26 B.T.A. 588, but we see no valid reason for parting company with the rationale of the Ninth Circuit cases cited in the reported opinion of the trial court. In the Colorado Coal case the company was allowed a claim for loss due to abandonment of a lower seam of coal. In that case the lower seam was set up as an individual accounting venture and asset, wholly separate and distinct from the surface and from the major vein, which two latter items were combined for accounting purposes. In the case at bar, appellant's original cost basis for tax purposes made no distinction whatever between surface and subsurface values. And, more important, we have in the case at bar valid declarations of desire to hold all unpatented mining claims, and payment of taxes on the patented claims, which of course would spell out retention of all subsurface minerals. In the Colorado Coal case, the company kept the major vein of coal and continued to operate its mining property.

*If,* in the case at bar, appellant had engaged in an *additional* exploratory operation which was abandoned in 1942, we would be presented with a wholly different fact situation, for if it had elected to continue mining operations we would not have necessarily found an inescapable inconsistency between the repeated declarations of desire to hold the unpatented mining claims in 1942, 1943 and 1944 and the asserted abandonment of its entire mining operations in 1942. In the Colorado case, supra, the Court said:

> "The existence of this seam [Wolf Creek] was known both to the petitioner and the mining section of the income tax unit *at the time of the valuation of the Wadge seam, but* in view of the known facts that the seam varied considerably in thickness and quality over the county, it was thought that *there were insufficient data on file to warrant the assignment of any value to the coal* [in Wolf Creek].

> "In 1921 petitioner decided to prospect the Wolf Creek seam and for this purpose started a slope about 500 feet north of the Wadge opening \* \* \*

> *"The surface of the coal property* in question was not abandoned or sold by the petitioner, because it was required in the petitioner's mining operations on the Wadge seam, and *its value had been and was included as a factor in the establishment of the depletion rate on that seam."* (Italics ours.)

Thus as to the unpatented claims of Talache, the sum total of appellant's interest was its right to fully exploit these claims for mining purposes. Aside from this right it had no tangible interest in the unpatented claims. Appellant could not "abandon" the mining aspects of these mining claims and thereafter keep them solely for resale for "recreational purposes."[5] Appellant's interest in them

---

5. Schlegel v. Hough, 1947, 182 Or. 441, 186 P.2d 516, 518, (Supreme Court of Oregon en banc, rehearing denied 188 P. 2d 158). This was a suit to quiet title to an unpatented placer mining claim in which the answer alleged that plaintiff had forfeited the claim by failing to perform assessment work or annual labor thereon (§ 28) or filing notice of intention to hold the mining claim (§ 28a). The court said:

"The required annual labor must be such as tends to develop the claim or to facilitate the extraction of minerals there-

represented only one "asset," i. e., the right to fully exploit their mineral wealth.

As the lower court pointed out in its Memorandum Decision, the *"declarations of intention to hold the unpatented claims * * * in legal contemplation necessarily related to the claims as mineral ground."*

In a practical sense it is true that more than one form of property interest stems from the existence of valid mining claims. These forms of interest are primarily physical possession of the claims along with a legal right to remove the subsurface minerals. It is appellant's theory that for tax loss purposes it may arbitrarily separate these two primary interests or rights by abandoning the mine beneath the surface, while retaining complete legal dominion over the surface area. But this assertion runs afoul of appellant's affirmative act of filing declarations of desire to hold the unpatented mining claims during 1942, 1943 and 1944, which acts, in our view, necessarily spelled out a deliberate purpose to retain every form of interest and right of exploitation which the law then gave and could give to the lawful possessor of these unpatented mining claims. It will not do for appellant to say that in 1942 it legally abandoned the subsurface mine and minerals, and in the same breath assert (as it did) a lawful right to retention[6] of every form of property interest that appellant possessed in these claims at the beginning of 1942, and which interest it had previously possessed in the land and in the subsurface minerals.

It is crystal clear from the record that appellant fully realized[7] that to retain full control over the unpatented claims during 1942 it must either comply with § 28 *or* comply with the wartime alternative, § 28a and make and file a declaration of desire to hold these mining claims during the year here involved.

The lower court found in part (Finding No. 9, supra) that there was no abandonment. Under our Rule 52(a) of Civil Procedure, 28 U.S.C.A. "In all actions tried upon the facts without a jury * * * *Findings of fact shall not be set aside unless clearly erroneous,* and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." This crucial finding is not "clearly erroneous."

Appellant's theory is that it sustained loss for income tax purposes because it "abandoned" a business asset, viz., the mine and minerals in the year 1942. An abandonment consists of two elements (neither of which do we find to be present in the case at bar):

(1) an *affirmative act* indicating an abandonment, and

(2) an *intent* to abandon.

The undisputed facts in this case clearly show that appellant evinced a bald and undisguised *intent to hold* and it annually performed an *affirmative act indicating a retention,* when it executed

---

from. 36 Am.Jur., Mines and Minerals, section 119. The question to be considered is whether or not the work was done in good faith 'for the purpose of working, prospecting or developing the mining ground embraced in the location, or for the purpose of facilitating the extraction or removal of the ore therefrom.' "

6. MacDonald v. Cluff, 68 Ariz. 369, 206 P.2d 730, 732 was a case construing § 28a, the relief provision enacted during the war which allowed owners of unpatented mining claims to file declarations of intent to hold mining claims in lieu of doing the $100 worth of labor or de-

velopment. The court said of the declaration under § 28a:
"The essentials are good faith, an absence of fraud or deceit, and *no intention to abandon the claim.*"

7. (Testimony of A. H. Burroughs, Jr.)
"The court: In the absence of filing of the notice of intention to hold you would have to go ahead and do the assessment work? A. We could have, yes, but we *would not have to do it.*
"Langroise: But to retain the claims you would? A. Yes, if we wanted to hold it we would have to do the assessment work or file the intention."

and filed the notices of desire to hold its unpatented mining claims in and during the years 1942, 1943 and 1944. To this significant gesture it added the payment of taxes on the patented claims for the years 1942 to 1945.

The lower court was "clearly correct" in finding and concluding that there was no abandonment of assets so as to allow a loss under Internal Revenue Code, § 23 (f).

Judgment is affirmed.

POPE, Circuit Judge (dissenting).

It seems to me that the majority opinion overlooks the fact that we deal here with a question of loss by abandonment as that term is used under the income tax regulations, not with the subject of forfeiture or abandonment of mining claims which is something quite different. The tax regulation which controls here is Regulations 111, § 29.23(e) 3, as follows:

"Sec. 29.23(e)–3. Loss of useful value.—When through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted * *) and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manu-facture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized."

That regulation is one which has been in effect in substantially the same form for so many years and during so many revisions of the Internal Revenue Code that it has the effect of law.[1]

When the provisions of that regulation are applied to the facts admitted and found here, it fits like a glove. In 1942 the mine workings and the old deposits suddenly and entirely lost their usefulness in the taxpayer's business. As the trial court found, the economic consequences of the war were such that "the mining properties could not profitably be operated in 1942". In that year it was unable either to lease or sell the mine. In the same year it removed the steel rails, hoist, locomotive, cars and all other machinery and equipment, and the mine was allowed to cave in. These findings of the court disclosed that the usefulness of all the underground workings of the taxpayer's property was suddenly terminated and such assets were permanently discarded from use in the business, and all this resulted from an identifiable event.

The fact that thereafter the taxpayer retained title to the claims which had some salvage value in no manner detracts from its right to claim a loss under the regulation. In fact, the regulation does not contemplate that the taxpayer should have sold or otherwise disposed of this property;—reference to it is made as an "exception to the rule requiring a sale or other disposition of property in order to establish a loss."[2]

1. See the reference to portions of this regulation in Boehm v. Commissioner, 326 U.S. 287, 292, 66 S.Ct. 120, 90 L.Ed. 78.

2. A multitude of cases so hold. S.S. White Dental Mfg. Co. v. United States, 55 F. Supp. 117, 121, 102 Ct.Cl. 115; Wheeling Tile Co. v. Commissioner, 4 Cir., 25

Also the reference in the regulation to "the salvage value of property" shows that retention of the title to the salvaged property beyond the year in question is contemplated.[3]

The case of Coalinga Mohawk Oil Co. v. Commissioner, 9 Cir., 64 F.2d 262, upon which the district court's decision is based, has no point here, and did not involve any construction of the regulation here in question. In that case the taxpayer had acquired a piece of land as an oil prospect. It was never drilled and no oil was ever produced, but in 1921 the taxpayer decided that it had no value for oil and offered to sell it at a sum far less than that which it had paid for it. It succeeded in making the sale in 1923. The court correctly held that there was no identifiable event which occurred in 1921 to permit a claimed deduction in that year. Obviously that is not the situation confronting us here.

I have the impression that if all the claims here had been patented mining claims, instead of just part of them, my associates would not question the soundness of what I have just said. But they seem to find some compelling reason for denying the deduction of loss in 1942 in the fact that in that year and thereafter the corporation filed declarations of its intention to hold possession of the unpatented mining claims for the purpose of taking advantage of the suspension of annual assessment work for those years.[3a] The majority opinion emphasizes the inferences drawn by the trial judge: "This intention in legal contemplation necessarily related to the claims as mineral ground", and concludes that: "Appellant merely had the right to the mineral wealth of such claims."

I concede that I am in doubt as to whether, under the law and the facts here found, taxpayer had the right to hold its surface rights in these unpatented claims as it attempted to do. As I shall point out, if it had continued to hold them for the purposes of further development in the hope of finding new mineral deposits other than those it abandoned in the caved-in workings, then it would have retained the surface rights. On the other hand, if, as is possible, it ran the risk of forfeiture by abandoning all idea of further mining, still that would in no manner lessen taxpayer's right to claim this loss.

Since 1872 the statute relating to unpatented mining locations has provided: "U.S.C.A. Title 30 § 26: The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, *shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations*, and of all veins, lodes, and ledges throughout their entire depth * * *." (Emphasis added.) As stated in Wilbur v. U. S. ex rel. Krushnic, 280 U.S. 306, 316, 50 S. Ct. 103, 104, 74 L.Ed. 445:

F.2d 455; United States v. Hardy, 4 Cir., 74 F.2d 841; Denman v. Brumback, 6 Cir., 58 F.2d 128; Rhodes v. Commissioner, 6 Cir., 100 F.2d 966; Dayton Co. v. Commissioner, 8 Cir., 90 F.2d 767; Commissioner v. Hoffman, 2 Cir., 117 F.2d 987. Cf. also Commissioner of Internal Revenue v. Peterman, 9 Cir., 118 F.2d 973.

3. Note the case of Mine Hill & Schuylkill Haven R. Co. v. Smith, 3 Cir., 184 F.2d 422, where a railroad in 1943 procured permission from the Interstate Commerce Commission to abandon a certain two mile long branch line originally designed to serve a certain mine. It sought to deduct a loss on account thereof in that year. It was held that the taxpayer's lack of intention to abandon before 1943 was not decisive, and that since the line had in fact not been used for some twelve years prior thereto the deductible loss was sustained in an earlier year and not in the taxable year 1943.

3a See the historical note appended to Title 30, § 28a, U.S.C.A.

"The rule is established by innumerable decisions of this Court, and of state and lower federal courts, that, when the location of a mining claim is perfected under the law, it has the effect of a grant by the United States of the right of present and exclusive possession. The claim is property in the fullest sense of that term; and may be sold, transferred, mortgaged, and inherited without infringing any right or title of the United States. The right of the owner is taxable by the state; and is 'real property,' subject to the lien of a judgment recovered against the owner in a state or territorial court. (Cases cited.) The owner is not required to purchase the claim or secure patent from the United States; but, so long as he complies with the provisions of the mining laws, his possessory right, for all practical purposes of ownership, is as good as though secured by patent."

This property right extends not merely to the mineral deposits,—the veins or lodes in place,—but the locator or his successor has an exclusive right of possession of the surface. In Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 226, 24 S.Ct. 632, 634, 48 L. Ed. 944, it was said:

"It will be seen that § 2322 gives to the owner of a valid lode location the exclusive right of possession and enjoyment of all the surface included within the lines of the location. That exclusive right of possession forbids any trespass. No one, without his consent, or, at least, his acquiescence, can rightfully enter upon the premises or disturb its surface by sinking shafts or other-wise. * * * That exclusive right of possession is as much the property of the locator as the vein or lode by him discovered and located."[4]

I think that the common understanding in the western mining states is as stated in McKenzie v. Moore, 20 Ariz. 1, 176 P. 568:

"The unquestionable right of the locator to the possession of the area within the boundaries of the claim marked on the ground by the requisite monuments as described in the location notice posted at the location monument carries the right to possession of every appurtenant belonging to the realty, including timber, soil, country rock, percolating waters, natural springs, except certain mineral springs and other things not material to this discussion."[5]

The locator of a mining claim acquires by his location such an exclusive right to the surface within his exterior boundaries that the Government, on the issue of patent therefor, cannot insert any exception for town lots within those boundaries, and such an exception, if inserted in the patent, is void. Talbott v. King, 6 Mont. 76, 9 P. 434. Error dismissed, Gwin v. Talbott, 136 U.S. 637, 643, 10 S.Ct. 1068, 34 L.Ed. 552.

I think it is clear that the owner of a completed mineral location does not, in the absence of an intent to abandon the whole claim, lose his right to possession merely by ceasing his mining operations. At the risk of having the claim open to relocation and forfeiture, the owner must satisfy the annual labor requirements of the statute, Title 30 U.S. C.A. § 28, but this labor is not required to consist of the extraction of minerals.[6]

4. At page 224, of 194 U.S., at page 633 of 24 S.Ct. of the same case: "'Some of the richest mineral lands in the United States, which have been owned, occupied and developed by individuals and corporations for many years, have never been patented.'"

5. For a discussion of the locator's right to the timber on his claim, even when located in a forest reserve, see United States v. Deasy, D.C., 24 F.2d 108.

6. Of course the removal of ore will satisfy the labor requirement but it may be satisfied not only by "work and labor",

If this particular taxpayer, after abandoning its old workings, had undertaken to expend $100 per year per claim in drill testing this ground for the purpose of discovering deposits other than those previously worked, this would satisfy the annual labor requirement. Walton v. Wild Goose Mining & Trading Co., 9 Cir., 123 F. 209, 217, 218.

There is no evidence here that in filing the declaration of intention to hold possession of the unpatented mining claims the taxpayer intended or undertook to retain anything other than its surface rights to these unpatented claims. The reality of those surface rights cannot be questioned. If it be assumed that surface improvements or surface work upon a mining claim cannot meet the annual labor requirement when the locator has in prospect no further mining operations within the claim,[7] the only result would be that the claims here would be open to relocation if the taxpayer had attempted to hold them through work and improvements, not meeting the standards of the Act. Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 645, 55 S.Ct. 888, 79 L. Ed. 1627.

But if we assume for the sake of argument, that aside from doing some digging of prospect holes, as in the Walton case, supra, or in United States v. Iron Silver Mining Co., C.C., 24 F. 568, or in sinking drill holes there would be no conceivable type of assessment work that could be done upon these claims, and if we also assume that the suspension statute was intended to be operative only in cases where the locator might hold his claim by the performance of annual labor, then the most that could be said would be that these particular mining claims were subject to relocation because the taxpayer was attempting to claim that to which he was not entitled under the law. But whichever way it be, whether the taxpayer properly and validly retained its surface rights to these claims, or whether it retained only a forfeitable interest therein, the consequence, taxwise, is the same. An abortive attempt to hold the surface alone would not tend in any manner to prove that the taxpayer had not abandoned the caved-in workings. Those on the unpatented claims were just as much abandoned as those on the patented claims. The working portion of these claims and their mineral deposits had been completely and finally abandoned in the year 1942 and the loss was made ascertainable and definite by an identifiable event. This is not the case of a simulated loss. The loss is real. The only question is as to the year in which it occurred. I think that the majority have given a wrong answer.

---

but by "improvements" which may include buildings and other structures, Power v. Sla, 24 Mont. 243, 61 P. 468, and roads to and from the claims, Doherty v. Morris, 17 Colo. 105, 28 P. 85; Sexton v. Washington Min. & Mill Co., 55 Wash. 380, 104 P. 614. Even the services of a watchman have been sufficient to meet this requirement. Altoona Quicksilver M. Co. v. Integral Quicksilver M. Co., 114 Cal. 100, 45 P. 1047. All this is subject to the proviso that what is offered as assessment work be calculated to bring about the development of the claim. Jackson v. Roby, 109 U.S. 440, 3 S.Ct. 301, 27 L.Ed. 990.

7. Cf. St. Louis Smelting & Refining Co. v. Kemp, 104 U.S. 636, 655, 26 L.Ed. 875: "Labor and improvements, within the meaning of the statute, are deemed to have been had on a mining claim * * * when the labor is performed or the improvements are made for its development, that is, to facilitate the extraction of the metals it may contain * * *"