STANLEY BURKE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59562. Filed June 29, 1959.

*Dermot R. Long, Esq.*, for the petitioner.
*Earl C. Crouter, Esq.*, for the respondent.

PIERCE, *Judge:* The Commissioner determined a deficiency of $19,622.87 in the petitioner's income tax for the year 1950.

The two issues for decision are:

(1) Whether the petitioner is entitled to deduct in 1950, as an abandonment loss under section 23(e)(2) of the 1939 Code, the cost of concrete building foundations and architect's plans for a luxury hotel on which construction had been suspended in 1946 following

---

the commencement of litigation affecting the property, and on which the construction had not been resumed up to the end of the year 1950, although petitioner still retained title to such property.

(2) Whether amounts totaling $4,339.94 which petitioner paid during the years 1946 and 1947, representing (a) legal fees incurred in defending title to the land on which the above-mentioned hotel was being constructed, (b) legal fees incurred in formulating plans for organization of a corporation to operate the hotel when completed, and (c) other miscellaneous expenses relative to the construction of the hotel, are deductible in 1950 as current expenses.

## FINDINGS OF FACT.

Certain facts have been stipulated. The stipulation of facts is incorporated herein by reference.

The petitioner, in the taxable year 1950, was a resident of North Sacramento, California. He filed his return for said year with the collector of internal revenue for the first district of California; and he reported his income thereon in accordance with the cash receipts and disbursements method.

The petitioner's principal business at all times here material was that of operating drive-in restaurants in California. In either January or February 1946, he was approached by two individuals, to furnish funds to them with which to exercise an option which they held in their own names, for purchase of a 160-acre tract of land situated along the so-called strip in Las Vegas, Nevada. Said individuals proposed that petitioner advance the necessary money, and in return therefor, receive stock in the Nevada Desert Inn Corporation, a corporation which they had organized to construct a luxury hotel on this land. Said corporation had theretofore engaged the services of an architect to draw plans for the proposed hotel, and had contracted with a local builder to construct it. The petitioner rejected the proposed arrangement; but instead, he arranged to take an assignment from said individuals of their option to purchase said land; and also in connection with such transaction, he gave to the Nevada Desert Inn Corporation an option to repurchase the land from him within 6 months. The petitioner then exercised the option so assigned to him, and took title to the property in March 1946, in his own name.

Immediately following petitioner's acquisition of said property, he commenced construction of the hotel himself, using the plans and arrangements that the Nevada Desert Inn Corporation had previously entered into. These plans called for construction of a 2-story hotel building of California ranch style, a separate garage, and a dormitory of about 30 rooms for employees. The construction was started by petitioner under the name of "Nevada Desert Inn"; but

it later was carried on under the name of "New Horizon Inn," which was expected to be the name of the hotel and its operating corporation. Such corporation was never formed.

Construction of the hotel proceeded through the spring and summer of 1946; and by August of said year, there had been installed the foundations for each of the above-mentioned contemplated structures, and also some wooden framework for the dormitory. The foundations consisted principally of continuous solid concrete bases, 3 to 4 feet deep in the ground, with building blocks above.

Petitioner in 1946 paid the contractor $23,427.50 for the work performed in said year, of which amount $8,036.62 was spent for lumber. He also paid in 1946, $3,000 to the architect for the plans for the hotel which the Nevada Desert Inn Corporation had ordered. The total of all said 1946 expenditures was $26,427.50.

In May 1946 the Nevada Desert Inn Corporation, which had originally been expected to construct and own the hotel, filed suit against the petitioner in a State court of Nevada (herein called Nevada Suit #1), to have the land on which said construction was under way impressed with a trust on its behalf. The petitioner retained both California and Nevada counsel to defend him in this action.

When Nevada Suit #1 was initially filed, petitioner's attorneys advised him that in their opinion the Nevada Desert Inn Corporation could not prevail; and accordingly, the petitioner did not then stop construction of the hotel. In late July 1946, petitioner's counsel obtained a dismissal of this suit. However, in August of the same year, the plaintiff therein filed an appeal from said dismissal. Thereupon, petitioner suspended construction of the hotel, until he and his counsel could determine the outcome of the appeal. He continued, for the time being, to employ a watchman and expend miscellaneous amounts for maintenance of the property. Construction however was never resumed thereafter.

In the following year, in late February or March 1947, a severe windstorm blew down the wood framing for the dormitory; and following this storm, the watchman was released and all activity at the jobsite was halted. During the remainder of the year, petitioner recovered some amounts from salvage of certain lumber and miscellaneous equipment. Thereafter until the end of 1950 (the year here material), no other destructive storm occurred, and the concrete foundations remained in good and usable condition.

In October 1947, the appeal in Nevada Suit #1 was dismissed by the Supreme Court of Nevada on motion of the present petitioner. However shortly before such dismissal, the Nevada Desert Inn Corporation instituted a second Nevada suit (hereinafter called Nevada Suit #2), on the same issues as those involved in Nevada Suit #1.

This new suit was thereafter settled by the parties and was dismissed with prejudice on November 16, 1950.

In April 1949, while Nevada Suit #2 was still pending, the minority stockholders of Nevada Desert Inn Corporation filed a suit in a California State court against said corporation and the petitioner, based on allegations of fraud and mismanagement of the corporation's affairs. The plaintiffs in this California suit sought $1,000,000 damages, but they made no attack on petitioner's title to the Las Vegas realty upon which he had started construction of the hotel 3 years previously. Petitioner was the only defendant served in this action. He obtained a dismissal of the action in the trial court, in January 1954; and an appeal from said dismissal to the California Supreme Court was decided in the present petitioner's favor in 1955.

In December 1954, while the above-mentioned California case was pending on appeal, the Nevada Desert Inn Corporation filed a third suit against the petitioner in the Nevada courts; and this case was decided in the present petitioner's favor in 1957.

In the early part of 1950, the taxable year here involved, petitioner and his attorney told the contractor that, due to the piling up of litigation, the hotel project would have to be abandoned. However, after the Nevada Suit #2 was dismissed with prejudice on November 16, 1950, petitioner's attorney, being of the opinion that such dismissal would be res judicata in the California suit, concluded that he might be able to obtain a similar dismissal of said California suit, and thereby enable petitioner to proceed with the construction of the hotel. He thereupon conferred with opposing counsel with a view to obtaining such a dismissal; but his efforts were unsuccessful. He then advised petitioner not to take any action either with regard to going forward with the hotel, or with regard to selling the property, "until we settled this California case." Petitioner's counsel was at all times optimistic that petitioner would win this suit; but, as before stated, it was not terminated in petitioner's favor until the year 1955.

At the end of the year 1950, petitioner still owned the Las Vegas property; and he did not sell any portion of it until the year 1956. Petitioner's title to the property was not being challenged in the pending California suit. As before stated, the concrete foundations for the proposed hotel remained in good and usable condition. By the end of the year 1950, the property had tripled in value. Also, by that time, several parties had expressed interest in acquiring the property for the purpose of erecting a luxury-type hotel thereon. At all times material, the petitioner and his attorney had definite plans to complete construction of the hotel, just as soon as the pending litigation was terminated.

Up to the end of the year 1950, petitioner had incurred the following costs and expenses in connection with the Las Vegas hotel

project, exclusive of the amount expended in acquiring title to the land: (1) $25,214.30, representing architect's fees, and also payments made to the contractor for labor, materials, and other construction costs; and (2) $4,339.94 for legal expenses incurred in defending title to the land on which the hotel was being erected, other legal expenses incurred in preparing for the organization of a corporation to operate the hotel, and reimbursements to attorneys for miscellaneous expenses relating to the construction of the hotel, which they had paid on petitioner's behalf. All of the foregoing costs and expenses were paid during the years 1946 and 1947.

Petitioner on his 1950 return deducted the above-mentioned amount of $25,214.30, as a casualty loss for said year; and he separately deducted the above-mentioned amount of $4,339.94 as miscellaneous expenses. The Commissioner, in his notice of deficiency, disallowed deduction for the first of said items on the ground that petitioner had not sustained any casualty loss in 1950; and he disallowed deduction of the second of the said items on the ground that the expenditures represented thereby were nondeductible capital expenditures.

Petitioner, in his petition to this Court, changed his position as regards the above-mentioned item of $25,214.30 from that taken in the return; and in said petition he claimed deduction for said item as an abandonment loss of the year 1950.

OPINION.

I.

The first issue for decision is that raised by petitioner in the first assignment of error contained in his petition to this Court. Such issue is in substance, whether petitioner is entitled to a deduction of $25,214.30 for the year 1950, on the ground that he sustained a loss in said year from a claimed abandonment and loss of useful value in respect of a partially constructed hotel in Las Vegas, Nevada.

The authorities indicate that where a taxpayer owns the fee to land and erects improvements thereon, he may, if the improvements lose their useful value and are actually abandoned and written off as a loss, become entitled to a deduction for an abandonment loss for such improvements, under section 23(e) of the 1939 Code, notwithstanding that he continues to retain title to the land on which the improvements have been erected. See *Williams Furniture Corporation*, 45 B.T.A. 928; *Fraser Brick Co.*, 10 B.T.A. 1252; *Kilby Car & Foundry Co.*, 4 B.T.A. 1294; *C. U. Connellee*, 4 B.T.A. 359. However, in order for a taxpayer to become entitled to a deduction for a loss of useful value and abandonment, there must be something more than mere diminution in value, nonuse of the property,

or contemplation of a writing off of the property as a complete loss. Rather, the taxpayer must establish that the property actually did lose its useful value, and that he, by reason thereof, actually did write off and abandon the property as an asset in the particular year for which deduction of the loss is claimed. See *Citizens Bank of Weston*, 28 T.C. 717, affd. (C.A. 4) 252 F. 2d 425; *W. B. Davis & Son, Inc.*, 5 T.C. 1195; *Talache Mines* v. *United States*, (C.A. 9) 218 F. 2d 491; *Commissioner* v. *McCarthy*, (C.A. 7) 129 F. 2d 84. The general rule was stated in *Commissioner* v. *McCarthy*, *supra*, to be as follows:

The rule to be deduced from the "abandonment" cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it, which act of abandonment must take place in the year in which the value has actually been extinguished. * * *

As regards the meaning of the phrase "loss of useful value," the applicable Treasury Regulations 111 under the 1939 Code, state:

SEC. 29.23(e)–3. LOSS OF USEFUL VALUE.—When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis * * * and the salvage value of the property. * * * The exception [to the general rule, requiring a sale or other disposition of the property in order to establish loss thereon] applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. * * *

Whether property actually did lose its useful value in a particular year, and whether the owner actually did abandon it as an asset in said year, are of course questions of fact, to be determined from a consideration of all the facts and surrounding circumstances of the particular case. In the instant case, we are of the opinion that the existence of neither of these essential elements has been established.

As regards the claimed "loss of useful value" of the partially completed hotel in La Vegas, the evidence fails to establish that any such loss occurred in the year 1950. The situation in brief was as follows. In 1946, petitioner acquired title to the land on which a new luxury hotel was to be erected; and in the same year, he began construction of the hotel, and actually installed the concrete foundations, together with certain wooden framework for a dormitory building. In August of the same year, the construction work was suspended, by reason of the appeal filed in Nevada Suit #1, which involved the property. Thereafter, in February or March 1947, while the construction was still being suspended, a windstorm blew down the wooden frame-

work for the dormitory;[1] and thereupon all maintenance activities for the property were discontinued, apparently because neither the land nor the foundations required maintenance care. At all times thereafter, and throughout the taxable year 1950, no appreciable change is shown to have occurred, either with respect to the physical condition of the property or its potential use. Indeed, the evidence establishes, and we have heretofore found as a fact, that by the end of the year 1950 the value of the hotel property had tripled, and several persons had contacted petitioner with a view to purchasing the same and erecting a luxury hotel thereon. There is no evidence whatever that either the concrete foundations which petitioner had installed, or the architect's plans for the hotel, had lost their useful value in the year 1950.

As regards any affirmative act of abandonment by the petitioner in the year 1950, due to loss of useful value of the property, the evidence is insufficient to establish such fact. While it is true that in the early part of 1950 petitioner and his attorney told the contractor that the hotel would have to be abandoned, the evidence does not disclose what, if anything, petitioner thereafter did to actually abandon the asset. The evidence does show however that, after the Nevada Suit #2 was finally dismissed with prejudice on November 16 of the same year (1950), the general picture took on a more rosy hue; and that petitioner's attorney then believed he could induce the parties to the then sole remaining item of litigation (the California suit) to dismiss that also on the grounds of res judicata, and thereby remove the only then pending litigation barrier to petitioner's resuming construction of the hotel. Even after efforts to obtain a dismissal of this California suit had failed, the advice given to petitioner by his attorney was, to refrain from any further construction work or any attempt to sell the property "until we settled this California case." We have herein found as a fact, that throughout the year 1950 petitioner and his attorney had definite plans to complete construction of the hotel, just as soon as the pending litigation was terminated. He actually retained all of the property intact until the year 1956.

We hold that in the taxable year 1950, there was no loss of useful value of the partially completed hotel project; and that petitioner did not, in said year, abandon the same. Accordingly, no abandonment loss is allowable for that year.

## II.

The next issue arises from the second assignment of error in petitioner's pleadings. It is in substance, whether petitioner is entitled

---

[1] Any casualty loss that may have been sustained as a result of the windstorm in 1947 was of course deductible only in that year, and not in any subsequent year.

to a deduction in the year 1950 of $4,339.94,[2] representing legal fees and expenses paid by him to his attorneys in 1946 and 1947. We have heretofore found as a fact, that such fees and expenses were related to the defending of his title to the hotel land, to the preparation of plans for organization of a corporation to operate the hotel, and to miscellaneous expenses with respect to the hotel properties.

We hold that none of these expenses are deductible in the year 1950. Most of them appear to have been nondeductible capital expenditures; but, even if it be assumed that they were currently deductible expenses, they would be deductible by petitioner (who was a cash basis taxpayer) only in the years 1946 and 1947 when they actually were paid, and not in any subsequent year.

*Decision will be entered for the respondent.*

---

[2] In the petition the amount was stated to be $4,330.61; but we have found as a fact that the correct amount was as shown above.